UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                Case No. 8:08-CR-381-T-24EAJ

JOSEPH N. SWEET,
JACK L. MALONE,

                    Defendants.

-----------------------------------------------------------

**March 8, 2010**

**Transcript of Excerpt of Trial Proceedings**
**TRIAL TESTIMONY OF JACK L. MALONE**
**Before The Honorable SUSAN C. BUCKLEW**
**United States District Judge, and a Jury**

APPEARANCES:

For the Plaintiff:      Cherie L. Krigsman
                        Office of the U.S. Attorney
                        400 N. Tampa St., Suite 3200
                        Tampa, FL 33602

                        Todd Ellinwood
                        US Department of Justice
                        601 D Street NW, Suite 7726
                        Washington, DC 20004

For the Defendant       Dionja L. Dyer
Sweet:                  Adam Scott Tanenbaum
                        Federal Public Defender's Office
                        400 N. Tampa St., Suite 2700
                        Tampa, FL 33602-4726


For the Defendant       Patrick D. Doherty
                        Brown & Doherty, PA
                        450 Carillon Parkway, Suite 120
                        St. Petersburg, FL 33716


Proceedings recorded by mechanical stenography, transcript
produced with computer-aided transcription.

1    *   *   *   *   *

2            THE COURT:  All right.  Mr. Doherty on behalf of

3    Mr. Malone, you may call your first witness.

4            MR. DOHERTY:  Thank you, Your Honor.  If it

5    please the court, we would call Mr. Malone to the stand.

6            THE COURT:  Mr. Malone, if you would have a seat

7    in the witness chair, sir.

8            Mr. Malone, I'm going to ask Miss Vizza to swear

9    you in.  If you would raise your right hand.

10   Whereupon:

11                   JACK L. MALONE,

12   called as a witness, having been first duly sworn according

13   to law, testified as follows:

14           THE COURT:  Mr. Doherty.

15           MR. DOHERTY:  Thank you.  May it please the

16   court, counsel.

17                 DIRECT EXAMINATION

18   BY MR. DOHERTY:

19   Q.    Please state your name for the record.

20   A.    Jack Lee Malone, M A L O N E.

21   Q.    Mr. Malone, where do you reside?

22   A.    Compostela on the island of Cebu in the Philippines.

23   Q.    In the Philippines out in the Pacific?

24   A.    Yes.

25   Q.    When did you move out there?

1    A.      Next month it will be seven years.

2    Q.      Prior to moving out there, let me draw your attention

3    to the years 1999 through 2000.

4    A.      Yes, sir.

5    Q.      Do you remember those years?

6    A.      Yes, sir.

7    Q.      When did you become aware of a tax controversy or a

8    tax issue in your life?

9    A.      I heard a lot of people talk about tax issues.  I've

10   heard people speak on TV, pro and con or whatever.  It

11   grabbed my attention like it would anybody.  And I've heard

12   people speak on it.

13   Q.      Did there ever come a time when you joined a group

14   called Global Prosperity?

15   A.      Yes.  I believe it was 1998, a friend of mine had

16   invited me to go to the seminar, she paid the expenses

17   because we didn't have the money, my wife and I at that time

18   were working in a medical clinic and we hadn't been paid for

19   seven months.  They kept telling we're going to pay you next

20   week, we're going to pay you next week, they never paid us.

21   This woman said I'll pay your way to go to see the seminar,

22   so we went to see the seminar.

23   Q.      What did you find Global Prosperity to be?

24   A.      Global Prosperity had about I'd say 2,000 people in

25   the audience.  There was all kind of speakers, Congressman

1    Ron Paul, several lawyers, several different CPAs, business

2    people, doctors, people like that.

3    Q.     All right.  Let me go back and ask you whether this is

4    the same Ron Paul that was running for president in 2008.

5    A.     Yes, it is.

6    Q.     Okay.  And he was there at this meeting?

7    A.     He was the main speaker.

8    Q.     Okay.  And what was the gist of what they were saying?

9    A.     They were saying that taxes were voluntary, that, you

10   know, that a person is not required to file a 1040, but that

11   it's a voluntary system.

12   Q.     And was there also some talk about wages and whether

13   those were taxable, gave you taxable income?

14   A.     What they said was that wages were not taxable because

15   it's like, really, in a sense exchanging your life for

16   whatever you're working for, so it was not taxable.

17   Q.     It was like a property exchange?

18   A.     Yes, sir.

19   Q.     And therefore not taxable?

20   A.     Yes, sir.

21   Q.     And was any of this done undercover or was it in

22   public?

23   A.     Oh, it was very much in public.

24   Q.     Okay.  And how long did you find yourself in that

25   group?

1    A.    I think maybe, I really don't remember, but I think

2    three, four, five months.  I don't remember really.

3    Q.    And did you then begin the Joy Foundation with Dr.

4    Sweet?

5    A.    Yes, sir.

6    Q.    What caused you to do that?

7    A.    The things that they was doing at Global Prosperity

8    was an educational program, and I felt if, you know, if they

9    could market an educational program and they're reaching out

10   to certain people, that we could actually start our own

11   program, and that's what we did.

12   Q.    Was one of the goals to make money?

13   A.    Absolutely.

14   Q.    And did you do that?

15   A.    No.

16   Q.    I mean did you do the organization with Dr. Sweet?

17   A.    Oh, yes.  Yes.

18   Q.    And how did it go financially?

19   A.    I don't know any business, I've never run a business,

20   all I can say is that you had to buy desks and computers and

21   employees and rental and everything goes on and goes on and

22   goes on.  In other words, the last person to get paid would

23   be me.

24   Q.    Okay.  And when did it start?

25   A.    It started, it actually started in January of 2000.

1    Q.      And what were the ideas behind the Joy Foundation, the

2    same as Global Prosperity?

3    A.      Yeah, I would say it was the same, but the idea that I

4    had from this, I've had, see my background is I've been a

5    minister since I was 20 years old, so I'm used to like

6    ministering or educating people, so when I saw this as an

7    educational program I saw it as a unique position where you

8    could educate people.  And from what everybody had instructed

9    us, and everything, everything was above board, everything

10   was legal and there wasn't anything that was hidden.

11   Q.      Well, let me go back to that for just a second.  What

12   were your beliefs as to the legality of this?

13   A.      I believed that the voluntary system, you know, I

14   could be just simple, but I believe the word voluntary means

15   voluntary.  You volunteer to do something.

16   Q.      And is that what you told people?

17   A.      Oh, yes.

18   Q.      And did you tell them that their wages were not

19   taxable income?

20   A.      I never got into the teaching part of it because I

21   didn't know enough of the, what section 26 or 23 or title, I

22   didn't understand those things.  So what I told people is

23   that here's an educational program, I looked at it myself, I

24   verified it with different people that I've talked to, and

25   but what I want you to do is I want you to do is check this

1      out for yourself.

2      Q.      By the way, how did you verify it?

3      A.      The way I verified it, and see, this is the most

4      absurd thing that I'm going to say and this is when I came

5      back from Global Prosperity, they had given you a packet with

6      information, and in the packet was, I believe it was Title 26

7      of the IRS, so I'm spending like three days here and I was

8      enjoying it because it was free on some island and everyone

9      telling me that, boy, this is great, and we've never had any

10     problems or whatever.

11             Now, whether I was gullible or not, I don't know,

12     but when I came back, the very first thing I did when I came

13     back to the United States, I took that book that they had

14     given me, I believe it was Title 26 or 23, I don't know which

15     one it was, but I went directly downtown Tampa to the IRS

16     building out there by the football stadium and I went in to

17     the front room and I went over somewhere to the left and

18     there was like a counter there, and at that counter I asked

19     someone, I said can I speak with someone that can tell me

20     because, to be honest with you, here's what happened.  I just

21     came back from a seminar, I believe it was the Bahamas, I

22     don't remember, I went to a seminar and they told me that

23     taxes were absolutely voluntary, that you could do it or you

24     didn't have to do it.  And so I said, you know, even though

25     this sounds good, I want to find out myself if this is the

1    truth.

2         So the woman came up there and I handed her the

3    book, and I said, please, I mean, I don't want to endanger

4    myself or anybody else, but the truth is, is it true that

5    taxes are voluntary?  And she took the book for a minute and

6    she didn't say anything and she said wait a minute, I'll go

7    get someone else.

8         She got someone else farther back to the office,

9    I don't know whether it was a male or female, and the person

10   came out and I said, I'm here, my name is Jack Malone, I live

11   in Clearwater, and my question is I just came back from a

12   seminar, three day seminar where these people told me that

13   this system is absolutely voluntary, and that I don't have to

14   file a 1040 form.  Is there somewhere in this book that

15   you'll show me this so I'll know it for myself?  And the

16   person looked at it for just a few minutes, waited, walked

17   back and got a third person.

18        The third person came out and I asked, I'm not

19   going to go through the whole thing, I said the whole thing

20   was this.  Can you please show me in this book, is the tax

21   system voluntary or is it mandatory or whatever?  And not a

22   one of those people could answer my question.

23        Now, what happened to me at that moment when I

24   came out of the IRS office, I began to think, wait a minute,

25   maybe this seminar that I just went to, these people must be

1    right because here's three people that work at the IRS and

2    nobody can tell me what it says.

3                Now, that wasn't the end of my search.  I don't

4    believe that you can just go to one person and seek out

5    advice.  I don't even do that to people that have needs, so I

6    started contacting lawyers.  One of them that I can mention

7    that we used exclusively at the foundation was Melvin Baxley.

8    Q.    Where was he a lawyer?

9    A.    Gainesville, Florida.

10   Q.    In Florida?

11   A.    Yes, sir.

12   Q.    And was he a normal member of the Florida Bar?

13   A.    Absolutely.  I believe for 35 years in good standing.

14   Q.    All right.  Did you consult him with it?

15   A.    Absolutely.

16   Q.    Who else?

17   A.    Eduardo Rivera, another attorney.

18   Q.    Where is he a lawyer?

19   A.    I think he's Texas, San Antonio, I believe.  There was

20   several different lawyers that I went to to find out what do

21   you think?  And the thing is I'm not a lawyer, I don't claim

22   to be a lawyer, I'm not a CPA, I don't understand those

23   things and everything, so when I went to a lawyer, I said

24   just put it to me plain, is there a law that requires me as a

25   U.S. citizen to file a 1040 form.  And he sets in the chair

1    and rolls back and said absolutely not.  There's no law that

2    requires it.

3    Q.    Did you seek the advice of CPAs?

4    A.    Absolutely.  CPA, one of the main people on our board

5    is a CPA's name is Richard Edgar.  His cousin was a governor

6    in the state of Illinois.  He served --

7    Q.    Not Blagojevich.

8          I interrupted at a wonderful time.  Can you tell

9    me, our organization, what organization are you referring to?

10   A.    Joy.  I'm referring to Joy.

11   Q.    I'm sorry.

12   A.    So Richard Edgar, I'm just trying to show you the

13   caliber of people that we was working with.  Richard Edgar

14   has written 150 trusts for Rupert Murdoch.  He resides in

15   Hollywood, California.

16   Q.    Wait a minute.  Do you know that to be the case or are

17   you just saying what people told you?

18   A.    I'm saying what he told me.

19   Q.    Let's not do that.  Did you consult with him?

20   A.    Yes, sir.

21   Q.    Did you also have occasion to talk to people who had

22   worked for the internal revenue?

23   A.    On several occasions.  The first --

24   Q.    Wait a second.  Let me just stop you for a second.

25   Were they presently working for the internal revenue or had

1   they worked?

2   A.      Had worked for the internal revenue.

3   Q.      And what were those people's names?

4   A.      Well, first of all, the reason that I had known about

5   these people, in USA Today there were three full page ads in

6   the newspaper.  If something that we're doing is illegal, why

7   would a person buy an ad in the full page in the USA Today.

8   The first person I met his name was Joseph Banister.

9   Q.      Was he in that ad?

10  A.      Yes, absolutely.

11  Q.      And was he an IRS agent?

12  A.      A former IRS agent.  He had been with the criminal

13  division, I believe, for 17 years.

14  Q.      Did you consult with him?

15  A.      Many times.

16  Q.      Did he tell you that what you were doing was illegal?

17  A.      He said what I was doing was legal and the reason that

18  he quit working for the IRS is because he morally could not

19  continue the job that he was doing based on the knowledge

20  that he had.

21  Q.      Who else did you talk to?

22  A.      There's a man whose name is John Turner.  John Turner

23  also was with the IRS.  His father was a, a lifetime working

24  person for the IRS and John Turner had put in 13 years

25  himself.  John Turner came and stayed in my house overnight

1    on occasions and he sat down and told me the very same story.

2    He said I'm just like anybody else.  He said he went to a

3    meeting like I had gone to and asked people, I mean he heard

4    the whole story and he didn't believe it himself.  So he said

5    he got out his own book and he started going through it and

6    everything and he said the reason that I resigned from my

7    job, Jack Malone, is because I am a Christian, and morally I

8    couldn't continue to do this, and so he also left the IRS.

9    Q.      Ultimately did you come to believe that income taxes

10   were voluntary in nature?

11   A.      Absolutely.

12   Q.      Did you come to believe that wages were exempt from

13   income tax?

14   A.      I did believe that, yes, sir.

15   Q.      Did you tell that to other people, customers of the

16   Joy Foundation?

17   A.      When I approached anybody with the information of the

18   Joy Foundation, I first of all gave the disclaimer that I'm

19   not a CPA, I'm not a lawyer, I'm not trained in this.  But

20   the information I have, I'd like for you to look at it

21   yourself and based on your opinion what you think.

22   Q.      Did you know that IRS disagreed with this position?

23   A.      Well, from my trip I made downtown, no, they didn't

24   disagree.  Nobody said I would go to prison.

25   Q.      Okay.  But did you, when you put on the seminars, did

1    you wonder, maybe, is there an IRS person in the audience?

2    A.    Oh, I would, and I don't say this facetiously, I would

3    gladly welcome the IRS agent into the conversation or

4    whatever.

5    Q.    Okay.  Now, did there come a time when Mr. Sweet

6    received an injunction?

7    A.    He -- I understand he had an injunction in February

8    sometime, I don't know whether it was 2001.  I didn't know at

9    the time that he had an injunction though.

10   Q.    Did there come a time when you got a letter from the

11   Department of Justice saying you were covered by the

12   injunction?

13   A.    What happened was I didn't.  When I came back from the

14   Philippines, I have never been back to the United States in

15   that seven years.  When I came back from the Philippines and

16   Mr. Doherty showed me a letter that shows that there was an

17   injunction, I told him, I don't remember ever seeing that

18   letter.

19   Q.    All right.  Was there a reply made to that letter?

20   A.    Yeah.  That's what I don't understand.  If you

21   remember yesterday that my secretary, Naomi Hall, testified

22   that even in April when they say it was April 4, she didn't

23   know about any injunction.  I didn't know about any

24   injunction there was.  But, yes, I received a fax from Milton

25   Baxley and it was like, I don't know, maybe six or seven

1  pages of some kind of rebuttal form.  I didn't know what it

2  was about.  Maybe Robert Lawrence had sent it to him, which

3  was the Joy Foundation, or maybe Yvonne sent it to him or

4  maybe Dr. Joe, I don't know who sent it to him.  But I had

5  faxed because you can see on the top of the letter that it

6  came from Milton Baxley.  And I was told to send it out.

7  Q.     And did you sign it and send it out?

8  A.     I tell you the truth, I don't remember doing it but I

9  guess I did because that appears to be my signature.

10  Q.     Okay.  And did there come a time in October or

11  November of 2002 that you received an injunction against you

12  and the Joy Foundation?

13  A.     In October?

14  Q.     October or November of 2002.

15  A.     Absolutely.  Absolutely I did.

16  Q.     And how did that affect you?  Tell the jury how it

17  affected you.

18  A.     Well, if you can have the blood drawn out of your

19  body, that's exactly what it felt like.  I was sitting in a

20  chair much like this in the entrance to the Joy Foundation

21  and a man walked in, I guess you call him a server, I don't

22  know what they are, the man came in and hand me a big

23  envelope.  And I opened it up and it said this was from some

24  court I believe, yeah, in Peoria, Illinois that I was being

25  told an injunction, told me stop doing this.  Then it went on

1    to say that you have ten days to comply to this and there was

2    like several things they told me to do.

3    Q.      And was one of them to mail out a copy of this

4    injunction to numerous people?

5    A.      Absolutely.

6    Q.      And did you try to do that?

7    A.      I didn't try.  I did it.

8    Q.      And did you stop selling Joy Foundation to people?

9    A.      That very day when I got the injunction, I didn't call

10   Dr. Joe, I didn't call Milton Baxley, I didn't call anybody.

11   I read that for myself and saw that I was to stop what I was

12   doing, so we closed the doors that very day.

13   Q.      Okay.  Did there come a time when the government

14   brought you before that judge for the proposition of

15   demonstrating that you had complied or not complied with the

16   injunction?

17   A.      Yeah.  I was brought to Peoria, Illinois and I went

18   before I believe it was Judge McDade and Judge McDade, let me

19   tell you, the reason I came back here, I mean there's 7,100

20   islands in the Philippines, I could have run for a long, long

21   time, but my mom taught me to never run from a situation

22   that's at hand, and so when I heard that I had to come back

23   here, I had consulted a minister friend and he said whatever

24   you do, turn yourself in.  And I wrote the prosecutor, I

25   forgot her name, Sherry, and I told her, what can I do to

1    resolve this?  I haven't been back to the United States.

2              I told Judge McDade when I was in that chair in

3    Peoria, I said --

4              THE COURT:  We're switching back and forth in

5    time it's hard to follow.

6              THE WITNESS:  I'm sorry.

7    Q.    Follow, if you could.

8    A.    I'm sorry.

9    Q.    Draw your attention to the hearing before Judge

10   McDade.

11   A.    Okay.

12   Q.    Do you remember that hearing?

13   A.    Yes, sir.

14   Q.    What was the outcome of that hearing?

15   A.    The outcome was that we had been told to stop the

16   foundation, but we had then received a call, I believe, I

17   believe it was Milton Baxley, I'm not positive, but this

18   order that had been given had been vacated, so we sent out

19   like several more packages.  Like two days or three days

20   later we had gotten a word back that the, what do you call

21   that, vacated thing was not in force, that we were supposed

22   to stop.  So when I sat before Judge McDade I explained to

23   him, I said, sir, I did everything humanly possible in my

24   power to stop the things that we were doing, but we had

25   received word that it had been vacated, so we sent out some

1    more packages.  But Judge McDade, when I found out that this

2    was truly an injunction, we were to stop, we sent the checks

3    back to those people.

4    Q.    Okay.  And what was the result of that hearing?

5    A.    I was found not guilty.

6    Q.    Okay.  And what did you do at that point?

7    A.    I told him I was sorry and I said I'm sorry, I did

8    everything I could to stop when you told me to stop, and I

9    promise you you'll never see my face again.  I'll never ever

10   touch this stuff as long as I live.  And when I went back

11   home, I tore up all the books, I destroyed the CD, I got rid

12   of the fliers and everything.

13   Q.    And what did you do then in April?

14   A.    Well, before I had a meeting with IRS, okay, I went to

15   the Philippines on April 4 and I've never been back to the

16   United States.

17            MR. DOHERTY:  I have nothing further, Judge.

18            THE COURT:  All right.  I'm not sure who's going

19   to cross.  All right.  Mr. Ellinwood.

20                    CROSS EXAMINATION

21   BY MR. ELLINWOOD:

22   Q.    Mr. Malone, you just testified that you were going

23   through a process of discovery about the tax laws and that

24   was in the late 1990s you joined, you were a member of Global

25   in 1998, correct?

1    A.    I believe that's true.

2    Q.    And you consulted these various lawyers and CPAs after

3    that time period?

4    A.    After I had been to the seminar, Global Prosperity,

5    yes, I came back and began to do research.

6    Q.    So this is 1998 going forward, 1999, you're continuing

7    to make your discoveries, 2000?

8    A.    No.  I was pretty well convinced after I had been to

9    Tampa to the IRS building and no one could answer my

10   questions and then I begin to talk to the lawyers, yes.

11   Q.    And what was the date of that?  I mean I know you're

12   not going to know the exact date.  What was the approximate

13   date of your visit to the IRS office?

14   A.    I honest to God don't know.

15   Q.    If the Global Prosperity thing was 1998, was it

16   between 1997 and 2000, is that fair?

17   A.    It could be, but I don't know.

18   Q.    Do you think it was before 1995?

19   A.    Oh, no.

20   Q.    But, Mr. Malone, you had not filed a tax return since

21   1992.

22   A.    Well, it's embarrassing to say, I know that you could

23   say I haven't filed a tax return, but it's like the case I

24   have right now.  I've been here for six months and I'll just

25   say from January 1 to right now I've made $900.  Sir, as a

1    minister, there's some times you don't make money.  There's

2    sometimes you make very little money.  And so when I went to,

3    I think it was H and R Block and I had taken them the records

4    I had, the man looked at me and laughed and said you didn't

5    even make enough money to get money back or to file a return.

6    Q.      You did not file a tax return, correct?

7    A.      That's right.

8    Q.      Now, before 1992 you did file returns fairly

9    regularly?

10   A.      Yes, sir.

11   Q.      And you did that because you knew you had a duty to

12   file a tax return?

13   A.      No.  I filed a tax return because I had made some

14   money and, yes, I did owe the money, yes.

15   Q.      And you knew you owed the money.  And then in 1992 and

16   '93, you just decided to stop paying your share?

17   A.      No.  That's not true.  What happened, I believe it was

18   1992 and some of those other years, I didn't make enough

19   income to be taxable.

20   Q.      Now, you said that you became involved with Global

21   Prosperity in the mid to late 1990s, is that correct?

22   A.      Yes, sir.

23   Q.      And that organization professed tax avoidance

24   techniques and trusts, didn't it?

25   A.      Yes, sir.

1  Q.    In fact, in the conversation with the undercover

2  agent, you called it a scam, didn't you?

3  A.    I don't remember calling it a scam.  I said some of

4  the investments that some of these seminars put out, yes,

5  they can be scams.

6  Q.    Now, these people you talked about, Milton Baxley and

7  these other lawyers and CPAs you referred to, they weren't

8  around in 1993 when you made the decision to stop filing,

9  were they?

10 A.    No.  They wasn't there when I was making no money to

11 file a return.  And if I had made money or if I had worked

12 someplace where I would have gotten a W-2 and they didn't

13 take the money out, it just went back to the IRS, I guess.

14 Q.    Now, you told the agents in March of 2003 that you

15 wouldn't talk about income taxes because of your religious

16 beliefs.  Not paying taxes is part of your belief system,

17 isn't it?

18 A.    I based on not paying taxes -- I do believe in paying

19 taxes first of all.  You know, that's not true at all.  I do

20 believe in paying taxes.

21 Q.    That's not what I asked you.  I said you told the

22 agents in March of 2003 that you wouldn't talk about income

23 taxes because of your religious beliefs.  You didn't say some

24 other reason, you said I'm not going to talk to you about

25 income taxes because of religious beliefs.

1    A.    I don't remember.

2    Q.    And isn't it true that not paying taxes is part of

3    your belief system?

4    A.    Absolutely.

5    Q.    And your belief system collides with the law, doesn't

6    it?

7    A.    No.  Not at all.

8    Q.    You to this day believe that you do not need to file a

9    tax return?

10   A.    I believe that what it says on the form is that it's a

11   voluntary situation.

12   Q.    So to this day you still disagree with the law, don't

13   you?

14   A.    Absolutely, no, I disagree with it 100 percent.  When

15   I was told to comply with the law, I did it.

16   Q.    I want to talk about while you were at Joy.  You said

17   that you were, on your direct testimony just a few minutes

18   ago you said that you were, quote, the last person paid was

19   me.

20   A.    Yes.

21   Q.    You said that.

22   A.    Yes, sir.

23   Q.    So the last person in line was able to afford a

24   monstrous house on the 19th hole -- on the 17th hole, is that

25   right?

1    A.    A person who would be able to rent one, yes.

2    Q.    And sometimes you rented.  You rented a nice condo on

3    the beach for $3,000 a month, didn't you?

4    A.    I always rented because I never could qualify for a

5    loan to get a house.

6    Q.    Well, to the undercover you said you always rented.

7    A.    That's right.

8    Q.    You always leased so that the IRS wouldn't know about

9    it.

10   A.    No.  That's not true.

11   Q.    So you had a Harley-Davidson motorcycle, didn't you?

12   A.    Yes, sir.

13   Q.    And you put 12,000 dollars cash down on a 19,000

14   dollar motorcycle?

15   A.    Yes, sir.

16   Q.    And yet the last person paid was me?

17   A.    That's right.

18   Q.    One of the last people that testified for the

19   government was Special Agent Goodwill.  He showed that the

20   money that was going through the Joy Foundation, $250,000 a

21   year.  You were able to afford a $3,000 condo, a recent

22   vintage Cadillac, a Harley-Davidson motorcycle, and yet you

23   told the agents that Joy was breaking even?

24   A.    That's absolutely the truth.  No, the truth is I,

25   there's many times I didn't get paid.

1  Q.    Did you have another job?

2  A.    No, sir.

3  Q.    How were you paying for the monstrous house on the

4  17th hole, a $3,000 condo on the beach, a Harley-Davidson

5  motorcycle?

6  A.    I didn't live in two houses at one time.  And the

7  condo, the reason that was being rented is because we were

8  going to close the Joy Foundation offices and be moved to

9  that area and then we'd be able to consolidate the cost of

10  the expenditures of what we had.

11  Q.    You were writing a check to your landlord for $3,000 a

12  month for that condo, right?

13  A.    Yes, sir.

14  Q.    And yet Joy was breaking even?

15  A.    That's right.

16  Q.    Now, during that time period when you had these cars

17  and you were riding on the roads, weren't you using federal

18  highways?

19  A.    Yes, sir.

20  Q.    Using the post office?

21  A.    Yes, sir.

22  Q.    Public utilities?

23  A.    Yes, sir.

24  Q.    Did you fly?  You flew around to Aruba and Jamaica?

25  A.    Yes, sir.

1    Q.    And those planes, I mean you're here today, none of

2    those planes crashed, right?

3    A.    I hope not.

4    Q.    And they didn't crash because we have federal

5    government agencies like the FAA that provide for that, isn't

6    that correct?

7    A.    Yes, sir.

8    Q.    And during the time period that you were at Joy, you

9    were protected by our military forces?

10   A.    Yes, sir.

11   Q.    And yet taxes are voluntary?

12   A.    No.  That's not true.  Because what happens with the

13   road that I used, the gasoline tax that I'm paying for is

14   paying for the building of the roads.

15   Q.    It goes towards that, but you know that's not the only

16   thing paying for the roads.

17   A.    That's the only thing I know.

18   Q.    What was the tax that you were paying for that covered

19   the military?

20   A.    I don't know.

21   Q.    It's the federal income tax, isn't it?

22   A.    I'm sorry.

23   Q.    It's the federal income tax, isn't it?

24   A.    I don't know.

25   Q.    Now, you have a college degree?

1    A.      No.

2    Q.      You do not have a college degree?

3    A.      No.  I have one year in Central Bible College.

4    Q.      You know that income tax has paid for lots of things,

5    right?

6    A.      I'm sorry.

7    Q.      You know that income taxes pay for lots of things,

8    right, that list that we just went through?

9    A.      Yes, sir.

10   Q.      How about this courthouse?

11   A.      Yes, sir.

12   Q.      So taxpayers are paying for your right to have your

13   day in court today?

14   A.      And I thank them for that.

15   Q.      Yeah, you thank them.  Not you, because you don't pay

16   into the system.

17           One of the ideas that you promoted while you were

18   at Joy was foreigners working in the United States, they have

19   to pay taxes, correct?

20   A.      I didn't understand any of that stuff.  I wasn't a

21   teacher.  All I was was a salesperson, a marketing person.

22   Q.      You were selling something that you didn't understand?

23   A.      Yes, sir.

24   Q.      At all?

25   A.      That's right.

1    Q.    At all?

2    A.    Very, very.

3    Q.    How about this.  Did you ever say these words, even if

4    you didn't know what they meant?  People living, people from

5    outside the United States working in the United States, they

6    need to pay taxes, and Americans living abroad, they need to

7    pay taxes?

8    A.    I don't remember that, sir.

9    Q.    Okay.  Have you filed a tax return since you went to

10   the Philippines?

11   A.    I've lived in the Philippines and I'm a resident

12   there.

13   Q.    You're a resident there, but you're still an American

14   citizen, correct?

15   A.    Yes, sir.  I don't make money from America.

16   Q.    Doesn't matter.  What you advocated before was

17   American citizens living abroad need to pay taxes, so now

18   you've moved abroad.  Have you filed a tax return?

19   A.    I didn't advocate that because I didn't teach it.  I

20   didn't know it.

21   Q.    That's convenient, isn't it?

22         All right.  You said that on the tape with the

23   undercover agent that when April 15 rolls around you just say

24   so what.  Did you hear that on the tapes?

25   A.    I believe so.

1 Q.      And in your meeting with Mr. Mynatt on January 23,

2 2002, didn't he ask you whether you had gotten letters from

3 the IRS?

4 A.      I believe so, but I don't remember.

5 Q.      He said, quote, have you gotten letters from them

6 though, end quote?  Do you remember him saying that?

7 A.      No, I don't remember it, but I'm not saying he didn't.

8 Q.      What was your response?

9 A.      Well, anytime that someone got a letter it was

10 referred to a lawyer or a CPA or Dr. Joe.

11 Q.      And exhibit 51B on page 43, when he asked you the

12 question have you gotten letters from them though, your

13 response was, no.

14 A.      I thought you was referring to members.

15 Q.      When you were talking to the agent, he said have you

16 gotten letters from them, and you said no.

17 A.      I don't believe I had.

18 Q.      Okay.  But you had gotten a letter from the IRS, in

19 fact, just weeks earlier, hadn't you?

20 A.      What letter is that?

21 Q.      Revenue Agent Jeannette Czachur testified, and we have

22 in evidence the letter that she sent you in January of 2002,

23 and it was found in the search of Joy.  Do you remember

24 receiving that letter?

25 A.      No, I don't.

1    Q.    No, you don't.

2    A.    I'm not lying about it.  I didn't come 8,000 miles to

3    lie.

4    Q.    The IRS letter tells you that you're being

5    investigated for promoter's investigations and that didn't

6    give you pause?

7    A.    I don't remember seeing it.

8              MR. ELLINWOOD:  Can I approach, Your Honor?

9              THE COURT:  You may.  Why don't you tell us what

10   you're showing him.

11             MR. ELLINWOOD:  This is exhibit 27.

12             THE WITNESS:  I don't remember ever seeing this

13   letter.

14   BY MR. ELLINWOOD:

15   Q.    You heard Miss, Revenue Agent Czachur testify that she

16   sent that to you, didn't you?

17   A.    She may have said she sent it, but I've never seen

18   this letter.

19   Q.    And that when she sent things to folks like you and

20   Mr. Sweet who are not filing, that she would send it

21   certified mail, didn't she?

22   A.    I guess so.

23             MR. ELLINWOOD:  Your Honor, may I approach?

24             THE COURT:  You may.  Why don't you tell us what

25   you're showing him?

1          MR. ELLINWOOD:  I'm sorry.  Exhibit 514.

2    BY MR. ELLINWOOD:

3    Q.     Now, sir, can you tell me what exhibit, or can you

4    tell me what exhibit 514 is?

5    A.     Department of Treasury.

6    Q.     It's a letter from Miss Czachur, isn't it?

7    A.     No.  It's from Janet Matthews.

8    Q.     It's from Janet Matthews.  I'm sorry.  Who is it

9    written to?

10   A.     It says Jack Malone.

11   Q.     And what's the date?

12   A.     January 8, 2002.

13   Q.     And in the lower right-hand corner is there a Bates

14   number on it?

15   A.     J F 005672.

16          MR. ELLINWOOD:  Your Honor, I'd like to admit

17   government exhibit 514.

18          MR. DOHERTY:  No objection, Judge.

19          THE COURT:  Received in evidence, 514.

20   Q.     I'd like to advise the court that Special Agent Hayag

21   has identified this as being seized in the search of the Joy

22   Foundation.

23          So, Mr. Malone, this letter that Miss Matthews

24   sent you, that she sent you certified, that Special Agent

25   Hayag says he found in the search of the Joy Foundation, that

1    on the lower right-hand corner has the Joy Foundation Bates

2    markings, you're saying today in this court that you did not

3    receive this letter?

4    A.    I'm saying before God and every person in this room

5    that I do not remember ever seeing this letter.

6    Q.    Now, in this letter the IRS is telling you that you're

7    being investigated with respect to your tax shelter

8    promotion.  When you received this letter, that didn't give

9    you pause?

10   A.    I'm telling you, sir, I don't remember ever seeing

11   this letter.

12   Q.    Let's go back to the undercover's discussion with you.

13   After he asked you about whether or not you had received any

14   letters, he asked you, quote, what about the foundation?  Has

15   the IRS tried to do anything about the foundation?  And your

16   answer was, quote, one thing, unintelligible, about what

17   we're doing and everything, you know, but I said once again,

18   we will respond, you know.

19          You did not, you didn't tell him at that point

20   the IRS had sent you a letter saying that they were about to

21   begin a promoter investigation about you?

22   A.    Are you talking about this letter?

23   Q.    Yes.

24   A.    That's the letter I'm telling you I don't remember

25   ever seeing.

1    Q.    All right.  So you don't remember the IRS telling you

2    in January of 2002 that what you're doing was wrong?

3    A.    That's my testimony.

4    Q.    But now let's move on the Department of Justice.

5    A.    Yes, sir.

6    Q.    Now, in fact, I'd like to back up about the Department

7    of Justice and go back a little bit chronologically.  You

8    were well aware that the Department of Justice had filed a

9    complaint against Mr. Sweet in early 2001, weren't you?

10   A.    One day Dr. Sweet had, we met in St. Petersburg, I

11   believe it was for coffee, we was having a meeting, he said

12   he had some type of papers or whatever.  I was going through

13   a divorce at that time.  We sat down at the table.  He shows

14   me some papers.  He said it's a civil action.  I felt from

15   what I understood it was something that maybe previously with

16   a client or something, but I didn't know nothing about it.

17   Q.    When did you become aware that he was involved in

18   serious litigation with the Department of Justice?

19   A.    I don't know whether -- I don't know whether it was

20   Milton Baxley told me, I don't know who it was that told me.

21   Q.    All right.  So you're saying you didn't know, but you

22   told the undercover, quote, there's nothing I keep hidden

23   from him and there's nothing that he keeps hidden from me.

24            MR. DOHERTY:  Objection.  That's not what he

25   said.  He said he didn't know who told him.

1        THE COURT:  All right.  I'll sustain it.

2        MR. ELLINWOOD:  Your Honor, may I approach?  It's

3   exhibit 457.

4        THE COURT:  You may.

5   BY MR. ELLINWOOD:

6   Q.    Mr. Malone, I've just shown you exhibit 457.

7   A.    Yes, sir.

8   Q.    What is this letter?

9   A.    It's a letter that Dr. Joe sent to me.

10  Q.    And what date did he send it?

11  A.    September 3, 2001.

12       MR. ELLINWOOD:  Your Honor, I'd like to admit

13  government exhibit 457.

14       MR. DOHERTY:  Judge, may we approach the bench

15  briefly?

16       THE COURT:  Sure.

17       (BENCH CONFERENCE ON THE RECORD.)

18       MR. DOHERTY:  Your Honor, if it please the court,

19  we would object based on hearsay because in this exhibit 457

20  we have, we're objecting on hearsay, and I understand it's a

21  business record, but still in this exhibit there is a

22  recitation of facts that Joe Sweet is hearing from other

23  people who may have heard from other people and it's double

24  and triple hearsay, and --

25       THE COURT:  Can I just see the exhibit?

1        MR. DOHERTY:  It's damaging, of course, to Mr.

2   Malone because it alleges sexual impropriety and other

3   things.

4        THE COURT:  Okay.  What's the relevance of this?

5        MR. ELLINWOOD:  Right now I'm going to ask him,

6   he's going to deny he knows what's going on.  The end of the

7   letter directly related that he says I'm going to meet with

8   Milton Baxley about my, about a hearing about a Rule 11

9   sanctions thing clearly implies that he's keeping Mr. Malone

10  up to date on the litigation.  Mr. Malone just sat there and

11  said vaguely, how I got into it about it, but I didn't know

12  what it was.  This directly rebuts that.  And other portions

13  of the letter, Your Honor, I'm not going to go into now --

14       THE COURT:  But the problem is if I mark it in,

15  it's all in, not just, and the vast majority of it is not

16  relevant, so I'm going to sustain the objection.

17       (END OF BENCH CONFERENCE.)

18  BY MR. ELLINWOOD:

19  Q.     Can you show exhibit 393, please?  Now, could you go

20  to the next page?  Paragraph four on it, can you highlight

21  paragraph four?

22       Mr. Malone, this part of the injunction says,

23  both EDM and Sweet, either individually or doing business

24  through any entity, and their representatives, agents,

25  servants, employees, attorneys and others acting in concert

1    with any of them, are immediately and permanently enjoined

2    from, directly or indirectly, and then it's got a whole list

3    of things.

4              Doesn't this clearly apply to you and the Joy

5    Foundation?

6    A.    Sir, I don't see my name and I didn't see the Joy

7    Foundation on it.

8    Q.    What is the purpose of having it say and their

9    representatives, agents, servants, employees, attorneys and

10   others acting in concert with any of them.  That covers

11   nobody?  You read this to cover only EDM and Sweet?

12   A.    I don't know who all these employees are.  I don't

13   even know if he's got servants, I really doubt it.  He's got

14   a very small house.  Agents, representatives.  I wasn't an

15   agent or representative.

16   Q.    Were you acting in concert with him?

17   A.    Not to do anything illegal, no.

18   Q.    That's not what this says.

19   A.    I do not see my name there, no.

20   Q.    Could you go up, paragraphs two and three?

21             So when you got this, you knew --

22   A.    No, I didn't get this.

23   Q.    We'll get to that.  EDM and Sweet have engaged in

24   conduct subject to penalty under Section 6700 of the Internal

25   Revenue Code which conduct entitles the United States to

1      injunctive relief.

2                   Isn't it true that the next paragraph says that

3      EDM and Sweet have engaged in conduct that interferes with

4      the enforcement of the internal revenue laws which conduct

5      entitles the United States to injunctive relief pursuant to

6      Section 7402 A of the Internal Revenue Code.  Isn't that

7      accurate, what I just read?

8      A.      If you're saying that's what it is.  I believe it.  I

9      see it.

10     Q.      Can we put up exhibit number 394?  If you can

11     highlight the top dear Mr. Sweet through the list of names?

12                  This is a letter, this is exhibit 394, this was

13     from the Department of Justice attorney, Kari Larson, who

14     testified last week?

15     A.      Yes, sir.

16     Q.      And her letter says, dear Mr. Sweet, you are hereby

17     served with a certified copy of the court's order enjoining

18     you.  The order applies to EDM Enterprises, yourself,

19     individually and doing business through any entity, and your

20     representatives, agents, servants, employees, attorneys and

21     others acting in concert with any of them.  We interpret the

22     order to apply at a minimum to the following individuals and

23     entities who have acted in concert with you:  The Joy

24     Foundation, Jack Malone, and a list of others.

25                  And you're saying you never received this?

1    A.    What I'm saying, sir, is when I came back and I met

2    with Mr. Doherty, he showed me this letter and I told him I

3    said, Pat, I've never seen this letter.  I don't know

4    anything about it.  But he said, well, you must have had it

5    because you responded to it.  So --

6    Q.    And not just that, sir, let me interrupt.  Go to the

7    back page and highlight enclosures and down.  Miss Larson

8    testified that just for this very purpose she had all these

9    people, Robert Lawrence, Jack Malone, Yvonne Malone, Milton

10   Baxley all personally served.

11   A.    That's right.

12   Q.    You were personally served?

13   A.    Well, I don't know.  Spring Hill, I don't even know if

14   you know where it's at.  That's so far out in the sticks.  I

15   never had a visitor to my house.  This letter could have been

16   faxed, as you see it was sent to Mr. Lawrence, it was sent to

17   Mr. Yvonne Malone, it was sent to Milton Baxley.  All I know

18   is I got a five page rebuttal thing from Milton Baxley faxed

19   to my fax machine.

20   Q.    So when Miss Larson testified that she had you

21   personally served, you're saying she's not saying the truth?

22   A.    I'm not saying she's not saying the truth.  I'm saying

23   I don't remember this letter, I got a thing on the fax from

24   Milton Baxley to sign.

25   Q.    Let's talk about that thing that you got from Milton

1    Baxley to sign.  Actually, let's go back to the -- let's move

2    on to Miss -- you did send a letter back to her though,

3    correct?

4    A.      Yes, sir.

5    Q.      And in your reply to Miss Larson, you asked her what

6    gave her the right to, quote, pretend to extend the so-called

7    again, quotes, to Joy, you and others, didn't you?

8    A.      Sir, if you'll read that letter, if you'll see the top

9    of it, that was faxed from Milton Baxley.  In my best day of

10   life I couldn't have written a letter that nice.  I'm not a

11   lawyer, I don't even know those terms.  I don't know those

12   little squiggly signs you put on there or whatever the

13   document things on there, I could have never done that in a

14   thousand years.

15   Q.      So you're illiterate?

16   A.      Well, I can read, but there's no way I could have

17   written that letter.

18   Q.      You didn't write the letter.  You've said that.

19   A.      Yes, sir.

20   Q.      You signed it?

21   A.      Yes, sir.

22   Q.      So you adopted it?

23   A.      It appears to be my signature.  I'm saying -- I'm not

24   saying that I couldn't have signed it.  I'm saying that it

25   appears to be my signature.

1    Q.    You want us to believe that the letter that came from

2    the Department of Justice telling you its position with a

3    court order attached to it that was personally served to you,

4    and that you responded to, you never got that original and

5    you have no responsibility for the response letter sent to

6    the Department of Justice; that's your position today?

7    A.    No, sir.  I'm saying that I signed that letter, I do

8    know that.  It has to be my signature.  It appears to be my

9    signature.  And I'm not saying that I didn't.  And even if it

10   hadn't been and even though I didn't understand, it really

11   went to the, what do you call it, the train of thought that

12   Mr. Baxley had written in that letter by saying that I wasn't

13   doing anything illegal.

14   Q.    But the first line in plain English, this is to

15   acknowledge receipt of your letter.  It's responding to a

16   letter.

17   A.    Yes, I know that.

18   Q.    It's responding to a letter that you received.

19   A.    Okay.

20   Q.    Now, just a few days before this, this is in early

21   March, she sends a letter on March 7, 2002, you reply in

22   April of 2002.  But a few days before Miss Larson sent the

23   injunction papers and had it personally served on you, she

24   and some other Department of Justice lawyers filed suit

25   actually naming you in the DOJ complaint in Illinois, isn't

1    that correct?

2    A.    Wasn't that in October?

3    Q.    No.  You were served with a complaint, the complaint

4    is what gets the process started.  You were served with a

5    complaint in March, on March 5, 2002.

6    A.    I guess so.  I don't remember it.

7    Q.    When complaints are filed in federal court, people are

8    served.  Are you denying that you were served with a

9    complaint?

10   A.    I'm not denying.  I'm saying that the only thing that

11   I remember getting from the courts in Illinois was an

12   injunction.  I remember getting the injunction.

13   Q.    But you filed a response to this on April 18, 2002?

14   A.    Once again, it's virtually impossible.  I'm not, I'm

15   not trying to be hard, it's virtually impossible for me to

16   write and respond to any of those type of letters.  I don't

17   even know what I'm doing.

18   Q.    You didn't have, no lawyer entered an appearance for

19   you in that case?

20   A.    I didn't go nowhere.

21   Q.    You filed on April 18, 2002 a motion to dismiss based

22   on frivolous jurisdictional arguments?

23   A.    If that was filed, and I'm not saying it wasn't, it

24   had to be written by Milton Baxley.

25   Q.    Now, in fact, so the court on May 21, 2002, they

1    struck your pleading and gave you 30 days to answer.  You

2    failed to do that.  The court also ordered you to stop filing

3    on behalf of Joy and said you needed a lawyer to represent it

4    because it was an entity.  You can represent yourself and you

5    can represent yourself, but Joy needed a lawyer.

6    A.    Are you talking about Peoria?

7    Q.    I'm talking about Peoria.

8    A.    Are you talking about October?

9    Q.    I'm talking about much earlier than that.  I'm talking

10    about May, June.

11    A.    I honestly don't know what you're talking about.

12    Q.    Can you please show exhibit 402?  Paragraphs two and

13    three at first, please.

14    A.    Okay.  So the lawyer would have been Milton Baxley.

15    Q.    Mr. Malone is not an attorney and cannot therefore

16    represent an entity.  As a trustee of the foundation he is

17    ordered to obtain counsel to represent the foundation and to

18    have that counsel enter an appearance within 30 days of the

19    date of this order.  Failure to do so will result in a

20    finding that the foundation is in default.

21    Let's go to the next page.  Please highlight

22    paragraph four.

23    The judge has struck your pleading, you don't

24    have a lawyer?

25    A.    Yes, I do.

1    Q.    The judge just said you need to get a lawyer.  That's

2    what that previous --

3    A.    All of this, anytime I got something that had to do

4    with this, was immediately given to Milton Baxley.

5    Q.    This says that you have 30 days to file an answer,

6    that you need to follow the rules, and by the way, the

7    arguments raised in the now stricken motions regarding

8    subject matter and personal jurisdiction are entirely

9    frivolous and the court will not entertain those arguments

10   again.

11          So the court's giving you a chance to file a

12   normal answer, you have 30 days to do it, don't make these

13   frivolous arguments.  And because you did not file anything

14   with the court, you defaulted.  Isn't that correct?

15   A.    I would guess so.

16   Q.    The Department of Justice filed a motion for a default

17   judgment and permanent injunction a few months later in

18   September, didn't it?

19   A.    Yes, sir.

20   Q.    And the court granted that motion and issued a

21   permanent up injunction against you and Joy on October 18,

22   2002?

23   A.    Yes.

24   Q.    And you told the court in Illinois that you received

25   the injunction a little bit later.  You told them that you

ANTHONY ROLLAND
407.760.6023

1    received it on October 30?

2    A.    I don't know what date it was, but I did receive the

3    injunction.  I remember where I was sitting at when I got it.

4    Q.    So, Mr. Malone, you've testified that you can't

5    remember any of these letters or motions or anything like

6    that being sent to you, even the things sent by personal

7    service, you don't remember the complaint that was served by

8    personal service, you don't remember receiving that, but you

9    do remember receiving the injunction in October?

10   A.    Absolutely I remember that.  I'll never forget it.

11   Q.    All right.  Well, I have in front of me exhibit 405

12   and this is the transcript of the hearing that you had before

13   Judge McDade on February 13, 2003.  If we need, if you think

14   that will refresh your recollection on points, you let me

15   know.

16           You told the court that you received this

17   injunction on October 30, didn't you?

18   A.    I'm sorry.

19   Q.    In this hearing?

20   A.    The hearing in February?  I'm sorry.  Are you talking

21   about the hearing in February?

22   Q.    Yes.

23   A.    Okay.

24   Q.    Judge McDade is asking you questions, Judge McDade is

25   trying to figure out if you violated the order back in

1    November.

2    A.      Right.

3    Q.      He asked you when you received the order because you

4    had, you had a problem with mail, correct?  You did not

5    receive it right away?

6    A.      The injunction, the guy walked right in the door and

7    handed it to me.

8    Q.      In front of Judge McDade you said that it was mailed

9    to the wrong address and didn't he scold you for the reason

10   why was because you hadn't bothered to update your address

11   with the court?

12   A.      Oh.  You're not talking about the injunction, you're

13   talking about that first order.  And what happened -- here's

14   how this happened, is that I was told that there was supposed

15   to be a hearing in Peoria, Illinois.  Now I know what you're

16   talking about.  I'm sorry.  I was told there was, I mean they

17   was having a hearing in Peoria, Illinois, and I didn't know

18   anything about it, and the next thing you know I get a thing,

19   a letter in the mail and said that, you know, you've been

20   found in default.  And I said, and I contacted Milton, I said

21   how can I be found in default when nobody even told me I was

22   supposed to be there.  I would have been in Peoria.  When the

23   court orders me to come, I'm here.

24            MR. ELLINWOOD:  Your Honor, may I approach?

25            THE COURT:  You may.

1    Q.    Miss McClain, can you show exhibit 389 which has

2    already within admitted into evidence?  Go to the second

3    page, please.

4              Mr. Malone, this is the docket sheet, this is the

5    official court record for -- this is the official court

6    record?

7    A.    Yes, sir.

8    Q.    For your injunction proceeding in Illinois.

9    A.    Yes, sir.

10   Q.    Now, on the first page it says plaintiff USA and who

11   represented it, three different people, different DOJ lawyers

12   came and went.  But when you're a lawyer and involved in a

13   process you make an appearance.

14   A.    Yes, sir.

15   Q.    One of the names on there is Kari Larson.

16             Page two.  Defendant, the Joy Foundation, a

17   purported trust.  In the space where a lawyer would be

18   listed, nobody.  Defendant, can you highlight the top half

19   maybe?  Defendant Jack L. Malone, individually, and as

20   trustee of the Joy Foundation, represented by Jack L. Malone.

21   Robert Lawrence represented himself.

22             You keep talking about Milton Baxley.  Where is

23   Milton Baxley's name on this?

24   A.    He didn't go to Peoria, I did.

25   Q.    Did he ever enter an appearance?

1    A.    In Peoria?

2    Q.    Yes.

3    A.    No, sir.

4    Q.    So he was not your lawyer in Peoria?

5    A.    No.  I represented myself.

6    Q.    I've asked you a lot of questions about the different

7    proceedings in there and all of them you've tried to push off

8    on to Milton Baxley.  When I got a response to something, I

9    just gave it to Milton Baxley.

10   A.    The first time when you asked me if I was in Peoria,

11   Illinois, the answer is yes, I was there.

12   Q.    You're jumping to the end.  You ultimately go to a

13   hearing in Peoria?

14   A.    Yes.

15   Q.    In February of 2003?

16   A.    Yes, sir.

17   Q.    The Department of Justice filed a complaint against

18   you a year earlier and you filed a responsive pleading, you

19   filed on April 18, 2002, again, let's look at that.  Docket

20   entry number three.  Response by defendant Jack L. Malone to

21   motion to dismiss for lack of jurisdiction.  You made that

22   filing, didn't you?

23   A.    No.  Milton Baxley did that.

24   Q.    He was just pretending to be you and doing things

25   under your name?

1    A.    Well, if I could write a letter that good, it would be

2    great, but I couldn't.

3    Q.    You also, you asked the court on November 1 for 30

4    days to comply because the injunction had been mailed to the

5    wrong address?

6    A.    Yes, sir.

7    Q.    But it was mailed to the wrong address because you

8    hadn't bothered to update your address with the court.

9    Didn't a judge tell you that?

10   A.    I don't remember a judge telling me that, no, sir.

11   Q.    You don't remember the judge telling you that any

12   delay was your fault?

13   A.    What happens is when we was told to shut down the

14   foundation, I called Miss Larson, I think she testified to

15   that, and I told her that I had moved and I hadn't gotten

16   this material.  I told her, I said, Miss Larson, I'm working

17   as hard as I can to do everything that's required of me and,

18   please, would you give me a few more days so I can get this

19   done, and she abruptly told me no and that was it.  It was

20   finished.  She didn't give me no chance whatsoever.

21   Q.    Can you please show exhibit 403?  It's already in

22   evidence.

23            If you can highlight the text of the order.

24            All right.  Before the court is defendant Joy

25   Foundation and Jack L. Malone's motion for extension of time

1   to comply with the injunctive order.  Defendant's request for

2   an additional 30 days to comply with the injunctive order

3   entered by the order on October 21, 2002 on the grounds that

4   the defendants had moved from their previously listed address

5   and therefore did not receive --

6                THE COURT:  Slow down.

7   Q.      Apologize, Your Honor.  Of the time limit for

8   compliance with the order.  The record reflects that the

9   defendants were aware of the lawsuit as evidenced by

10  defendant Jack Malone's motion to dismiss the order for lack

11  of personal jurisdiction.  Despite being aware of the suit,

12  the defendants failed to notify the court of their change of

13  address.  Accordingly, the court denies defendant Joy

14  Foundation and Jack L. Malone's motion for extension of time

15  to comply with injunctive order.

16              So he's telling you you need to comply with this

17  right quick, right?

18  A.      I'm sorry.

19  Q.      He's telling you you're not getting any delay?

20  A.      That's right.

21  Q.      And this is filed on November 13, 2002?

22  A.      Yes, sir.

23  Q.      And yet you continued to ship Joy materials throughout

24  this time period?

25  A.      Oh, no, sir.  Please go back and if you will look at

1    the transcripts of that hearing, I explained to Judge Dade

2    what had happened, I think McDade is his name, I'm sorry, I

3    explained to him that we had been --

4    Q.    That's not the question I asked you, though.  That's

5    what you said to Judge McDade.  We're not going to go back to

6    the transcript.  Let's look at the documents.

7              Can we have exhibit 162?

8              Your Honor, may I approach?  This one's not on

9    the computer.  See if I can find it.

10             We'll come back to that.

11             Miss Larson sent you a letter dated November 27,

12   2002 where she said that it was the position of the

13   Department of Justice that you had failed to comply with the

14   court order; is that correct?

15   A.    Yes, sir, that is.

16   Q.    And Miss Larson filed a motion with the court to have

17   you held in contempt in December of 2002, is that correct?

18   A.    Yes, sir.

19   Q.    And in January the judge ordered you to appear in

20   February and show cause why you should not be held in

21   contempt?

22   A.    Yes, sir, that's true.  And the judge said I

23   substantially complied with the --

24   Q.    He said you substantially complied with it as of that

25   day, right?  He wasn't talking back in the past, he said that

1  as of February 13 you were in substantial compliance?

2  A.    All I know is the judge had given me a break because I

3  was trying as hard as I could.

4  Q.    Let's look at some of the stuff that was mailed out

5  between October 30 and November 5.  Exhibit 560.  Can you put

6  up exhibit 560?  All right.  So this is an UPS shipment

7  showing that you sent something on November 12?

8  A.    I told that to Judge McDade, yes.

9  Q.    Can you show the next one?  Is there one dated October

10  31?

11        Can I switch to the Doar, please?  This is

12  exhibit 162.  This is a record from UPS?

13  A.    Yes, sir.  Those are correct.

14  Q.    And it is showing that you sent two packages, not only

15  after the date of the injunction, but after the date of the

16  search.  These are two packages being sent on November 23,

17  2002?

18  A.    And I told Judge McDade that.  And I told him that we

19  also sent the checks back to those people.

20  Q.    Why did you send these out in the first place?

21  A.    Because what happens as I told you, sir, we was told

22  that the injunction had been vacated.  I wasn't trying, I

23  wasn't trying to hide from anything, I was trying to stop.  I

24  did everything I could in my power, and God is my witness, to

25  stop.  I was scared enough when I went to the hearing in

1    Peoria, felt like my head was going to be cut off, so I

2    admitted to him that these got sent out inadvertently, we

3    sent back the checks.

4    Q.    You mentioned the confusion about whether or not the

5    order was vacated.

6    A.    Yes, sir.

7    Q.    Let's go to that.  The entry that you're talking about

8    says judgment in a civil case filed on October 21 was entered

9    inadvertently and is hereby vacated.  That's what you're

10   honing in on, right?

11   A.    I believe so.

12   Q.    But the injunction was entered on October 18, not the

13   21st.

14   A.    I admitted to the judge that we had done everything

15   that we could in our power to stop.

16   Q.    Right.  And you tried to make this argument to the

17   judge and it went over like a lead balloon, didn't it?

18   A.    No, sir.  May I speak, please?  He told the IRS agent

19   that I had substantially complied.  She did the same thing,

20   tried to argue that I didn't, but I did everything that I

21   could in my power to stop.

22   Q.    When you made this argument to the judge, didn't the

23   judge say to you, so right there on the face of this

24   document, Mr. Malone had to know that this was not talking

25   about my October 18 order.  So far as carrying the day for

1    him to excuse --

2              MR. DOHERTY:  May I object to this and ask for it

3    to be introduced?  Is it 405?

4              MR. ELLINWOOD:  Yes.  The government moves in

5    exhibit 405, Your Honor.

6              MR. DOHERTY:  With no objection.

7              THE COURT:  All right.  I'll receive into

8    evidence 405.

9              405 is the transcript of the order to show

10   cause hearing in front of Judge McDade in the Central

11   District of Illinois, is that correct?

12             MR. DOHERTY:  It is, Your Honor.

13             MR. ELLINWOOD:  Can we go to page 15?

14   Q.     All right.  Can you highlight the part where it says

15   the court, maybe lines 12 to 23.

16             You made your argument about being confused about

17   whether or not this was vacated and isn't it true that the

18   court says, it won't be necessary, Miss Larson doesn't need

19   to explore this because the judge does not accept Mr.

20   Malone's excuse for the simple reason that his exhibit C says

21   the judgment in a civil case filed October 21 was entered

22   inadvertently and is hereby vacated.

23             Well, the order here was filed on October 18, so

24   obviously this cannot relate to the order of October 18.  So

25   right there on the face of this document Mr. Malone had to

1   know that this was not talking about my October 18 order.  So

2   as far as carrying the day for him to excuse his compliance

3   or starting back up thinking my order of October 18 had been

4   vacated, I do not accept that.

5   A.      He may have not accepted it, but if you read the rest

6   of it, he said I did everything that I could in my power to

7   stop it.

8   Q.      At the end of the day he did not put you in jail

9   because he said that you were in compliance as of February

10  13, 2002, isn't that correct?

11  A.      However you want to say it, sir.  All I know is I did

12  everything that I could in my power to stop.  If you notice,

13  not only when she was here yesterday, she said she was gone

14  that day.  Everything else was left for me to do.  I

15  guarantee you I didn't know how to send out one of these

16  packages.

17  Q.      You continue to make this argument with the judge,

18  much like you're doing now, and the judge said, quote, this

19  is on page 16, line 24, I don't find what you tell me to be

20  an acceptable excuse, sir, for your violating my order.

21  A.      That's the reason I apologized.

22  Q.      Because you were in violation of his order in

23  November?

24  A.      That's the reason I apologized to him.

25  Q.      Didn't you tell the judge that you knew by the middle

1      of November that the order actually hadn't been vacated?

2      A.      I'm sorry.

3      Q.      Didn't you tell the judge in this hearing that by the

4      middle of November you did know that the order had not been

5      vacated?

6      A.      Sometime.

7      Q.      You knew the injunction was in force by the second

8      week of November?

9      A.      Sometime in November, yes.

10     Q.      Sometime in November?

11     A.      Yes, sir.  All I can say is that from the time that I

12     knew that I was supposed to stop, I stopped.  We didn't even

13     bother with the phones.  We didn't take any faxes.

14     Everything was unplugged.

15     Q.      Mr. Malone, you filed for bankruptcy in 1994?

16     A.      Yes, sir.

17     Q.      And that's two years after you stopped filing tax

18     returns, isn't that correct?

19     A.      Yes, sir.

20     Q.      So you weren't paying into the federal system that

21     includes things like bankruptcy courts, isn't that correct?

22     A.      When you're broke, you're broke.

23     Q.      And in this bankruptcy your debts were discharged,

24     weren't they?

25     A.      Yes.  And I paid most of them that I could back.

1    Q.    You paid most of them back?  Why were you in

2    bankruptcy?

3    A.    Because I didn't have money at the time.  It was

4    embarrassing to file bankruptcy, so I went back to try to pay

5    those that I could and I did pay some of them off.

6    Q.    How about Mr. and Mrs. Bucher?

7    A.    Who?

8    Q.    Mr. and Mrs. Bucher, B U C H E R, didn't they put a

9    claim in your bankruptcy that they had given you a

10   substantial loan and you still owed them over $11,000?

11   A.    I'm sorry.  I don't remember that.

12   Q.    Well, was that debt wiped out in bankruptcy?

13   A.    It may have.

14   Q.    And didn't someone make a claim on behalf of your

15   second wife Kendra in the bankruptcy?

16            MR. DOHERTY:  I'd object to this as being

17   irrelevant.

18            THE COURT:  Sustained.

19   BY MR. ELLINWOOD:

20   Q.    Mr. Malone, when the laws of the United States work

21   for you, like bankruptcy laws, then you're willing to follow

22   them and take advantage of them, isn't that correct?

23   A.    Nobody wants to file bankruptcy, sir.

24   Q.    And when the United States Courts system like a

25   bankruptcy court can help you out, you don't any make any

1    weird claims that you're not a citizen and the you don't

2    claim that the court lacks jurisdiction?

3    A.    I've never said that I was not a citizen.

4    Q.    Let's talk about the undercover tapes.  In your

5    meeting with the undercover agent on September 23, 2002, he

6    asked you about the Tampa injunction and said, quote, and

7    this is from 64B, exhibit 64B, page five, quote, but when Joe

8    showed me the injunction and was telling me it doesn't

9    prevent him from doing anything, um, I was a little nervous.

10   So he's clearly talking about Mr. Sweet's injunction because

11   he said Joe, correct?

12   A.    Yeah.

13   Q.    I mean your injunction hasn't come down at this point

14   because it's September.  So he's talking about Joe's

15   injunction and your response was, quote, there has been no

16   injunction.  Isn't that what you said?

17   A.    What I may have said and believed was that it was a,

18   what is it they give you before they give you an injunction,

19   a warning or whatever it was, that's what I understood it to

20   be.  I didn't know because I didn't handle their legal stuff.

21   Q.    You were served a copy of this injunction and yet

22   you're telling the undercover agent, quote, there's been no

23   injunction?

24   A.    I don't know to which time he's referring.

25   Q.    You don't know to which time he's referring?

1   A.      No.  Maybe in the time that when you say my name Jack

2   Malone Foundation, I don't know what he's, if he's referring

3   to that or what he's referring to.

4   Q.      When Joe showed me the injunction, and this is

5   September of 2002, and there's only been one injunction,

6   February 20, 2002 injunction against Mr. Sweet, EDM and those

7   working in concert with him, when Joe showed me the

8   injunction and was telling me it doesn't prevent him from

9   doing anything, I was a little nervous.  And you said, quote,

10  there has been no injunction, and again you repeated, there

11  is no injunction.  Isn't that true?

12  A.      That's what I was told.

13  Q.      That's what you were told?

14  A.      Yes, sir.

15  Q.      All right.  And the undercover agent keeps pushing you

16  on this, so now he wants to know, he's already bought into

17  the program at this point, so now you're just trying to work

18  on him to get him to market.  He keeps pushing on this and he

19  wants to know what you tell prospects who ask about it.  And

20  again you tell him there has been no injunction.  And don't

21  you say, oh, yeah, it sometimes has effects or whatever, but

22  all we do is minimize it and say, yeah, it's the same thing

23  that I said three months ago, I was shot and killed.  Wasn't

24  that your response?

25  A.      I believe so, yes.

1    Q.      And so you just blow off the questions about the

2    injunction as if they were Internet rumors?

3    A.      Well, it wasn't too funny to think I've been shot and

4    killed three months ago.  I had all kinds of innuendoes and

5    things were being said about myself and the Joy Foundation.

6    Q.      But he wasn't asking about those, he was asking about

7    the injunction.

8    A.      Well, I apparently didn't understand what he was

9    talking about or I could have answered it more intelligently.

10   Q.      All right.  Well, this is from, I'm going to play you

11   a clip, clip 20, this is from 64B, page 16.  I'd like to play

12   one of the audio clips.

13           (AUDIO PLAYING.)

14   Q.      You had said in there in a portion of the tape that

15   they put stuff in there.  You're referring to the injunction

16   itself?

17   A.      Thank you for showing it.  That's exactly what I said.

18   What I been telling you all along.  I didn't know there was

19   an injunction.

20   Q.      You said that you saw how much money the government

21   alleged the loss was, six million dollars?

22   A.      I said I saw what was written on the Internet.

23   Q.      You're still denying that you read or saw this

24   injunction.

25           When the UC is asking you about the injunction,

1    you said that the documents say in there that Dr. Joe's

2    responsible for over six million dollars in lost revenue,

3    quote, it's a whole lot more than six million if you want to

4    know the truth, a whole lot more.  Isn't that an accurate --

5    A.    Yes, sir.

6    Q.    And at the end there, this is interesting, when the UC

7    continued, when the undercover continued to push you on this

8    issue, you said, but the thing I do is I minimize it because,

9    like you said, you can easily tell.  You know whether the

10    person's going to be receptive to it or not receptive to it.

11    And to me it just doesn't make sense of wasting your time.

12    If somebody's asking about the injunction and

13    they're pushing back on you, they are not likely to buy this

14    product so you're just going to move on, that's what you're

15    saying, isn't it?

16    A.    What I'm saying is if a person doesn't have interest

17    in the educational program, there's no sense in wasting your

18    time trying to sell it to them.

19    Q.    Now, here to the undercover agent, you didn't know he

20    was an undercover agent of course, you're talking about the

21    law, the civil action is not a federal action.  I mean you're

22    purporting to be knowledgeable about the law.

23    A.    It proves that I wasn't because I didn't know the

24    difference between civil and federal.

25    Q.    But you're just saying this then for just for sales,

ANTHONY ROLLAND
407.760.6023

1    this is just marketing pitch?

2    A.    You can say that.  But all I'm saying is I didn't

3    know.

4    Q.    Milton Baxley is not speaking for you there, you're

5    speaking there, right?

6    A.    Yes, sir.

7    Q.    Now, the reason to send letters to the IRS was to try

8    to create an artificial defense, wasn't it?

9    A.    My lord, no.  No artificial defense, no more than I

10   went down to the IRS and asked them face-to-face if this

11   thing was right or not.  If one person, one out of the three

12   would have said if this is illegal, do you think I'd be

13   sitting here today?

14   Q.    And the reason to send these letters is to make you a

15   less appealing target for criminal investigation, isn't it?

16   A.    No, it's not.  The reason it is is to ask sincerely am

17   I liable for this tax.

18   Q.    Didn't you tell the undercover, quote, you're going to

19   be able to say to the jury and everything I wrote to the IRS

20   on more than one occasion, end quote?

21   A.    That's right.

22   Q.    And that's what you're doing today?

23   A.    What am I doing today?

24   Q.    You're saying this to the jury I went to the IRS?

25   A.    I did.  Nobody forced me to go to the IRS.  I had to

1    do that to find out for myself the truth.

2    Q.    And when the undercover pushed back on you on this,

3    didn't you say, quote, what are they going to do, there's

4    only three million jail cells in America?  Didn't you say,

5    quote, what are you going to do, there's only three million

6    jail cells in America, end quote?

7    A.    Did I say that?

8    Q.    Did you say that?  You said that last week and

9    listened.

10   A.    It's on the tape?

11   Q.    It's on the tape.

12         Now, I want to go back to the January 2002

13   meeting that you had with the undercover.  In this meeting

14   you're trying to get him to buy membership, right?

15   A.    Yes, sir.  Well, I didn't try.  He walked in the door.

16   Q.    But once he comes in the door you want him to buy it?

17   A.    Sure.

18   Q.    And the undercover reasonably wanted to know if other

19   Joy clients had gotten into trouble with the IRS.

20   A.    And to my knowledge, from all I know, there was no

21   person that had ever gotten into trouble.

22   Q.    No one had ever gotten in trouble with the IRS?

23   A.    I'm testifying under oath that I don't know of one

24   person that ever got into trouble.

25   Q.    And in part of your pitch you tell the undercover that

1    the IRS is not part of the federal government, it's a private

2    corporation, correct?

3    A.      That goes with the point to show you how much I didn't

4    know.

5    Q.      Now, do you have a brother who worked for the IRS?

6    A.      Yes, I did.

7    Q.      What's his name?

8    A.      Gary.

9    Q.      And when did he work for the IRS?

10   A.      Many years ago.

11   Q.      And when the undercover agent asked you about the

12   package, didn't you say, quote, this is going to take care of

13   your taxes for the rest of your life?

14   A.      Yes, sir.

15   Q.      And the undercover asked you about the records that

16   you keep at Joy.

17   A.      Yes, sir.

18   Q.      And didn't you say, quote, the boys might want to

19   knock on my doors and everything, and that would be fine if

20   they want to, but they won't find any records, end quote.

21   A.      Yes.

22   Q.      You told him that, right?

23   A.      Yes, I did.

24   Q.      You were telling him that because clients don't want

25   the IRS to get their hands on any records.

1    A.      I told him that because I told him I have nothing to

2    be whatsoever afraid of.  The reason that the records were

3    off of the premises at that time was because we moved the

4    office, but I'm telling you right here in my testimony and

5    that is that I wasn't doing anything and I didn't believe

6    anybody else was doing anything illegal, but the people that

7    had joined said, well, I don't want my records around the

8    office.  I wasn't doing anything illegal or I wouldn't have

9    been in the business.

10   Q.      Now, you told him that the records were kept in space

11   or cyber space, right?

12   A.      Yes, sir.

13   Q.      And you just said clients wanted it that way, right?

14   A.      Not the cyber space, no.  The only reason that we had

15   what you call cyber space is so many times we have a

16   computer, I mean a computer can go down and you lose all of

17   your records so you did what they call send it out on

18   satellite and retrieve it.

19   Q.      But actually you did keep lots of records at the Joy

20   Foundation related to clients, didn't you?

21   A.      Yes, I did.

22   Q.      What you told him is not true?

23   A.      That's not, no, no.  What we had done is moved from

24   one building to another and the reason that the clients, they

25   ask when they joined that they wanted their privacy.  It's

1    not because I was doing something illegal.  Didn't believe

2    any of them were doing something illegal.

3    Q.     What you told the agent was when the boys come

4    knocking on the door, they're not going to find any records.

5    The boys did come knocking on the door in November of 2002,

6    didn't they?

7    A.     They sure did, and they found all of the records.

8    Q.     They found 22 records?

9    A.     22 records?

10   Q.     22 boxes.

11   A.     Yes, sir.

12   Q.     So when you're telling the undercover agent they're

13   not going to find any records, that's not true, you have lots

14   of records?

15   A.     Excuse me.  That was true.

16   Q.     All those records appeared between January 23, 2002

17   and November 2002?

18   A.     That's absolutely right.  I tried to tell you on more

19   than one occasion we had moved the office, and the records,

20   we was in, what you call it, a rental place where you kept

21   the records and we brought them to the office.

22   Q.     Now, Naomi worked in the same office she said from

23   July of 2001 to November 2002, isn't that correct?

24   A.     I believe so.

25   Q.     So you were in the same office from July of '01 to

1    November of '02?

2    A.    I believe so.

3    Q.    So the 22 boxes that the agents found in November of

4    2002, those did not appear after January 23, 2002 because of

5    a move.  You moved six months earlier.

6    A.    We had rented a rental space where we put them.  The

7    only reason we brought them to the building was because we

8    wasn't going to rent the space no more.

9    Q.    Why do you need to rent the space when you told the

10   agent you keep them in space or cyber space?

11   A.    That's just backup files, sir.

12   Q.    The undercover expressed great concern about the IRS

13   coming to his door.  Didn't you tell him that, quote, the

14   chances of the IRS coming to your door is very, very low?

15   A.    That's what I understand, yes.

16   Q.    Let's listen to, let me see if I can figure out, I got

17   the page number, let me see if I can figure out the exhibit.

18        We're going to listen to a clip from 51B which is

19   the transcript from January 31, 2002 undercover tape.  It's

20   clip five, please.

21        Now, to put the undercover at ease, you told him

22   that, quote, they don't really prosecute because it costs

23   $200,000 per person to prosecute.  If you're not doing

24   anything wrong, why are you talking about the cost of

25   prosecution?

1    A.      I was just speaking.

2    Q.      You were just speaking.  Now, the undercover had asked

3    you if anyone had been previously prosecuted, and you said,

4    no, no.

5    A.      Absolutely.  I didn't have knowledge of anybody that

6    was prosecuted.

7    Q.      Mr. Graffy was found guilty in April of 2000, wasn't

8    he?

9    A.      I don't even know Mr. Graffy.  I've never seen him in

10   my life.

11   Q.      So you told the undercover there's nothing I keep

12   hidden from Mr. Sweet and there's nothing he keeps hidden

13   from me, and you're telling this jury that Mr. Sweet

14   testified in not one but two trials for Mr. Graffy and he

15   never said anything to you?

16   A.      I'm testifying to this jury that Dr. Joe one time in

17   the knowledge I've got ever told me about Mr. Graffy.  I

18   never seen him until he walked in this door.

19   Q.      The undercover asked you about seizing bank accounts.

20   And you said later on when you buy trust, I'm going to show

21   you how to put your assets in something that's impregnable,

22   without a tax ID and a Social Security number, is that

23   correct?

24   A.      Yes, sir.

25   Q.      Now, the reason to open an account without an ID

1    number is to prevent the IRS from receiving information,

2    correct?

3    A.    That's not the only reason.  There are a lot of people

4    that the law doesn't require them to have a Social Security

5    number.

6    Q.    But the tax laws require banks to get ID numbers so

7    they can gather this information?

8    A.    I understand American Indians and the Amish people

9    don't have any type of number because of their spiritual

10   belief.

11   Q.    All right.  Now, when the undercover was leaving on

12   that day he joked about the fact that it was getting to be

13   that time of year to prepare tax returns and you said, that's

14   one thing I hate about it, everybody's, oh, April 15 coming.

15   I say so what.  Isn't that right?

16   A.    Yes, sir.

17   Q.    And so just every April 15 when you see on the news

18   armies of people lining up to pay their taxes, you just think

19   these people, these are silly people?

20   A.    No, I don't think they're silly people.  I believe

21   that they're doing what they feel is right.

22   Q.    They're doing what they feel is right.  And when the

23   president talks, depending on the president, tax cut or a tax

24   increase, do you think this is just hot air?  I mean why are

25   they talking so much about tax increases or tax cuts when

1   it's all voluntary?

2   A.     That's precisely my thought.  It is voluntary.  That's

3   what I was told.  It says it on its own form.

4   Q.     I mean, man, the president, these politicians are

5   wasting a lot of time talking about, you know, alcohol,

6   tobacco, firearms taxes, I guess that's your position, that

7   when you see people talking about the taxes ad nauseam on TV,

8   they're talking about these narrow bands of alcohol, tobacco,

9   tires, excise taxes?

10  A.     Maybe if you'd sit down with Mr. Paul, Ron Paul, he

11  would enlighten you as to what the alcohol, tobacco and

12  firearms is more than enough to care for the needs of the

13  country is what he said.

14  Q.     Now, after the injunction there was a New York Times

15  article on this that included Mr. Paul, wasn't there?

16  A.     I didn't see it, no.

17  Q.     Well, you know that Mr. Paul, Mr. Paul advocates

18  shutting down the IRS, but he says that the law is you have

19  to pay your taxes now?

20  A.     Exactly.

21  Q.     That's his position, right?

22  A.     Yes.

23  Q.     But the tax laws are valid, they're just confusing?

24  A.     Nobody can understand them.

25  Q.     Nobody can understand the tax laws.  But they're

1    there.

2    A.    I'm not saying to violate them.  I've never advocated

3    to violate them.

4    Q.    Now, the Joy Foundation, you said that the name Joy

5    stands for Jack or Yvonne?

6    A.    Yes, sir.

7    Q.    And so you and Yvonne created the Joy Foundation?

8    A.    Yes, sir.

9    Q.    And she worked at Joy seminars?

10   A.    You mean the Joy Foundation?  Yes.

11   Q.    Yeah.  When you were talking to the undercover about

12   Yvonne, you said that from working at Joy, quote, all of a

13   sudden she's never seen so much money in her life, end quote.

14   A.    Yeah.  Somebody's been on food stamps and welfare.

15   Q.    She's never seen so much money in her life?

16   A.    That's true.

17   Q.    You testified that, you told the special agents that

18   Joy was breaking even?

19   A.    That's the truth.

20   Q.    So Joy is both breaking even, yet your wife, now

21   ex-wife, has never seen so much money in her life?

22   A.    The reason I can say that is because we literally had

23   to stand in line to get handout food from a food bank.

24   Q.    Now, in the divorce, and you talked about this on the

25   undercover tapes, you were able to keep her from getting

1    anything because of the way you used the UBTO, the Joy

2    Foundation, correct?

3    A.      I remember saying that, yes.

4    Q.      And you told the undercover, she got nothing, end

5    quote, because you had everything in the trust.

6    A.      Didn't belong to me either, it belonged to the trust.

7    Q.      And when you say nothing, you mean nothing?

8    A.      No.  She got like 10,000 or something, I believe.

9    Q.      Now, when she was away and the divorce was going on,

10   you cleaned out the house, didn't you?

11   A.      No.  I took furniture because I had to move, too.

12   Q.      I'd like to talk about, you were interviewed twice by

13   IRS agents, right?

14   A.      You mean the undercover?

15   Q.      No, no.  By special agents.  You were interviewed by

16   Special Agent Garland at the search on November 22?

17   A.      Yes, sir.

18   Q.      And you were interviewed against by Special Agent

19   Daley who testified again today on March?

20   A.      Yes, sir.

21   Q.      Let's start with the interview by Agent Garland.  At

22   the beginning of the interview he read you your rights,

23   didn't he?

24   A.      When he came in, you got to realize I walked in from

25   my car, he told me to put my hands out where I can see them.

1    He's wearing a gun, everybody's running around all over my

2    office, so it's very hard to understand what anybody is

3    saying to me.  He says, he sat me in a chair and he said,

4    quote, this is in my office right now, not yours.

5    Q.    Special Agent Garland like all special agents has a

6    little card.  Didn't he read you your rights from the card?

7    A.    I believe he did.

8    Q.    And you told Special Agent Garland that you were not

9    trying to hide anything from the government, right?

10   A.    That's right.

11   Q.    When Special Agent Garland asked if Joy has a UBTO,

12   what was your answer?

13   A.    When he asked what now?

14   Q.    Special Agent Garland asked you if Joy has a UBTO,

15   what was your answer?  He testified in here that it was, he

16   did not want to answer.  Special Agent Garland asked you

17   about the board of directors of Joy, didn't he?

18   A.    Are you talking about when they was there for the

19   raid?

20   Q.    At the raid he interviewed you, he asked you a series

21   of questions.  Didn't he ask you about the board of directors

22   of Joy?

23   A.    I don't remember that, no.

24   Q.    And didn't you say you did not want to disclose that?

25   A.    I don't remember saying that.

1    Q.    You asked Special Agent Garland if you should stop

2    operating Joy?

3    A.    I, yeah, I asked him that because I said I was doing

4    nothing illegal.

5    Q.    And he told you that you were under criminal

6    investigation, didn't he?

7    A.    I believe so, but I don't remember.

8    Q.    And it would be in your best interest to stop?

9    A.    I don't remember him saying, I asked him three times

10   if it was all right to keep doing about business.

11   Q.    And he said it's not, didn't he?

12   A.    What I remember him saying is you do what you want.  I

13   didn't, that's the reason I was answering his questions

14   because I wasn't doing anything illegal.

15   Q.    Now, you were interviewed by Special Agent Daley and

16   Special Agent Derosa in March of 2003, right?

17   A.    Yes, sir.  Christian Daley called me where I was

18   living and he asked me if I would come in for an interview

19   because he thought that this thing could be ended up.  Now,

20   sir, the thing is that the reason that I conceded and said I

21   will gladly come in is because I had just come back from the

22   hearing in Peoria, the judge had found me not guilty of

23   whatever that was, and so I didn't at that point, I really, I

24   wanted to say no because I promised myself I'd never be

25   involved with this any more.  But he said well, we might be

1    able to get this thing closed down, would you do it.  And I

2    finally said, yes, I would do it.

3    Q.    You're saying that Special Agent Daley enticed you

4    into an interview by saying that we might be able to wrap

5    this up?

6    A.    I'm not inferring it, I'm telling you that.

7    Q.    Now, when you came in for the interview you were not

8    under arrest or in custody, were you?

9    A.    No, sir.

10    Q.    You were represented, you had a lawyer with you?

11    A.    Yes, I did.

12    Q.    And Mr. Daley, Special Agent Daley began the interview

13    by saying normally he would read you your rights but he said,

14    you know, the rights that were read to you by Special Agent

15    Garland at the search still applied, and he asked you if you

16    needed to have your non-custodial statement of rights because

17    you were not under arrest, do you need have to your

18    non-custodial statement of rights read to you again.  Do you

19    remember him saying that to you?

20    A.    Yeah.  I remember him saying that in his office, yes.

21    Q.    And you told Special Agent Daley that you were never

22    read your rights at the search?

23    A.    What I said, I'm intending the same thing, these big

24    guys are in my office carrying guns and they're scaring me,

25    whatever they tell me to do, I'm going to do.  And I don't

1    remember him reading my rights.  That's what I said.

2    Q.    Well, my question is you told Special Agent Dale that

3    you were never read your rights.

4    A.    To my knowledge, that's correct.  I'm not saying that

5    he didn't, I'm just saying that I don't remember it.

6    Q.    Now, you told Special Agent Daley that you would not

7    comment on your belief of paying income taxes because of your

8    own personal religious belief, isn't that right?

9    A.    Yes, sir.

10   Q.    So you actually understood the law required you to pay

11   taxes, but you're choosing not to do so because of your

12   belief?

13   A.    No, that's not true.  I'm saying the tax is a

14   voluntary tax.

15   Q.    What does that have to do with religious beliefs?

16   A.    Just my personal belief.

17   Q.    Now, part of the Joy scheme encouraged members to pay

18   2500 dollars for a UBTO and then to use it, correct?

19   A.    Yes, sir.

20   Q.    And Joy got $500 for each trust created?

21   A.    Yes, sir.

22   Q.    You told Special Agent Daley that you did not

23   understand the principles of a trust?

24   A.    Not at all.

25   Q.    And you cannot technically explain it?

1   A.      That's right.

2   Q.      So when you're selling this product to people, you're

3   selling them something that you do not understand?

4   A.      That's true.

5   Q.      All right.  You told Special Agent Daley that Joy was

6   breaking even every month after overhead and other expenses,

7   correct?

8   A.      Actually sometimes it was in the hole.

9   Q.      Now, but business was doing so well on September 23,

10  2002 that you told the undercover you were looking to hire

11  another office person.

12  A.      I don't remember that either.

13  Q.      You don't remember telling the undercover that you

14  were looking to hire another office person on September 23,

15  2002?

16  A.      I don't remember that, no.

17  Q.      Now, while you're suffering through unprofitable times

18  at Joy, you had a Cadillac and a Harley-Davidson, you had

19  both?

20  A.      I had used and I traded the vehicle I had for the

21  Cadillac.

22  Q.      So these are just old used cars.  The Harley-Davidson

23  that you got cost 19,000 dollars, didn't it?

24  A.      Yes, sir.

25  Q.      And you put 12,000 dollars cash down for that?

1    A.    Yes.

2    Q.    You told the undercover that you lived in a monstrous

3    house, you lived on the 17th hole, you had your own private

4    pool, a Jacuzzi and everything, isn't that correct?

5    A.    Yes, I did.

6    Q.    So you moved from that monstrous house to a condo on

7    the ocean in Clearwater that cost $3,000 a month?

8    A.    No, no, that was backward.  The condo was first and

9    then Spring Hill.  Because I couldn't afford the condo, I

10   moved to Spring Hill.

11   Q.    You saw Special Agent Goodwill testify today and he

12   went through the bank records showing that Joy had over

13   $250,000 come into its account in 2002.

14   A.    Uh-huh.

15   Q.    You're saying that all went away on overhead and

16   expenses?

17   A.    I'm saying that if a person bought the first package

18   for 1650, only 650 of that came to the foundation.

19   Q.    That's exactly right.  So it's not that when you

20   receive, when you received the proceeds, the way you guys had

21   it structured is not that you would get the 16 whatever, 50,

22   and then send out the 600, the director would collect the

23   1680, isn't that correct?

24   A.    Sometimes, yes.

25   Q.    And then they would send on to you the 680?

1    A.      Sometimes.

2    Q.      So you didn't need to send a thousand back to that

3    director, he already took it?

4    A.      Right.

5    Q.      All right.  So, again, you told Special Agent Daley

6    that during the raid Special Agent Garland told you that what

7    you were doing was legally correct, you can do whatever you

8    want?

9    A.      Are you asking me that?

10   Q.      I'm asking you did Special Agent Garland tell you to

11   continue marketing Joy?  Did he give you permission?

12   A.      What he said was do what you want.

13   Q.      Do you want the jury to believe that a federal law

14   enforcement agent who is the case agent on this case who is

15   conducting a criminal investigation has gone to a magistrate

16   judge to get a search warrant and is now executing the search

17   warrant at your business said do what you want?

18   A.      If I'm not doing anything illegal in the first place,

19   I don't have nothing to be afraid of.

20   Q.      That's not what I asked you.  The special agent

21   doesn't, the special agent thinks you're doing something

22   wrong, doesn't he?

23   A.      I would suppose.

24   Q.      That's why he's there.

25   A.      Okay.  But he wasn't proven.

1    Q.      Now, exhibit 405 is admitted into evidence.  Didn't

2    you also tell the special agents that you stood before the

3    judge and told him that the IRS told you this, that you told

4    the judge that IRS had told you that you could do what you

5    were doing because it was legal?  Didn't you say that to

6    Special Agent Daley?

7    A.      I don't remember exactly how that was said, no, I

8    don't.

9    Q.      When Special Agent Daley was pushing you on this claim

10   of yours that Special Agent Garland had given you permission

11   in some form to continue operating, you told that to him

12   three times, didn't you?

13   A.      What I do remember about that meeting was they asked

14   those questions and Agent Garland took his coat off, slammed

15   it on the ground and started cussing, and at that point

16   Milton Baxley said this meeting is adjourned.

17   Q.      Now --

18   A.      I volunteered to come in there to offer information.

19   Q.      Now, Mr. Malone, I'd like to go over the events at the

20   end of 2002 and the beginning of 2003.  In mid October 2002,

21   that's when the federal judge in Illinois issued an

22   injunction against you, Joy and others, right?

23   A.      Yes, sir.

24   Q.      And in November federal law enforcement agents

25   executed a search warrant at the Joy Foundation?

1    A.      Yes, sir.

2    Q.      And in late November the Department of Justice

3    attorney that was handling the injunction case wrote you and

4    told you that it was the government's position that you were

5    not complying with the injunction, is that right?  She sent

6    you a letter dated November 27.  Is that right?

7    A.      Sir, I don't remember really.  I'm serious.

8    Q.      Now, in December she went ahead and she did file a

9    motion with the court in Illinois asking that you be held in

10   contempt, right?

11   A.      Yes.

12   Q.      And in January of 2003 the judge in Illinois ordered

13   you to appear before him in February to show why you should

14   not be held in contempt?

15   A.      Yes, that's right.

16   Q.      So the heat's on?

17   A.      I'm sorry.

18   Q.      The heat is on?

19   A.      Yes.

20   Q.      And at that hearing in February the judge found that

21   you were in substantial compliance with the injunction as of

22   that day, but he had said that in November you were violating

23   his order.

24   A.      I did my best before Judge McDade to explain to him

25   the situation, how that I done everything in my human power

1    to stop when he told me to stop and that I was sorry, I would

2    never do it again, he'd never see my face.  And that was the

3    truth seven years ago last month, I've never touched or done

4    this stuff again.

5    Q.     So after the judge works you over in February, in

6    March you're interviewed a second time by IRS special agents?

7               MR. DOHERTY:  I object to the characterization.

8               THE COURT:  I sustain the objection.  Ask the

9    jury to disregard the *works you over* comment.

10   Q.     In March of 2003 you were interviewed a second time by

11   IRS special agents?

12   A.     I volunteered to go in, yes, sir.

13   Q.     You knew that you were a target of a criminal

14   investigation?

15   A.     I didn't know when he called me to come in there if he

16   was referring to the injunction we had just had, but even if

17   I would have known it was concerning a criminal

18   investigation, sir, I still would have shown up.

19   Q.     Again, this is in March of 2003 and you're being

20   interviewed a second time by IRS agents?

21   A.     In March?  No, there's only one time in March.

22   Q.     It's the second time you've been interviewed?

23   A.     I see.  I'm sorry.

24   Q.     You were interviewed by them at the search in November

25   and you said people were guns and an Army of agents, there's

1    ten agents going through your office for a raid.  I mean

2    that's a big deal, isn't it?

3    A.      Yeah, it is.

4    Q.      So that happens in November, the Department of Justice

5    is after you in November and December and January, you have a

6    hearing in February, and in March of 2003 you were

7    interviewed by IRS special agents, is that correct?

8    A.      Yes, sir.

9    Q.      So you knew that you were a target of a criminal

10   investigation?

11   A.      That's the reason I came in because he told me maybe

12   this thing could be resolved.

13   Q.      And then you left for the Philippines just one month

14   later, right, you left in April?

15   A.      Yes, sir.

16   Q.      Now, let's talk about you coming back from the

17   Philippines.

18   A.      Yes, sir.

19   Q.      You were indicted in May of 2009, correct?

20   A.      No.

21   Q.      When were you indicted in this case?

22   A.      What happened, I didn't know anything about this until

23   I got an email, I think it was sometime in May from Robert

24   Lawrence in Peoria, Illinois and he said did you know that

25   you and Dr. Joe have been indicted.  I told him I had no idea

1     what he was even talking about.  But from what I understand

2     the arrest of Dr. Joe is that in September the year before.

3     So if there had been some kind of a court thing announcing

4     that I'm supposed to be there, nobody contacted me, so I

5     contacted them when I heard about it.

6     Q.     I'll ask that question again.  I mean when were you --

7     you were indicted in the spring of last year.  I mean we

8     don't need the exact date.  You were indicted in the spring

9     of 2009?

10    A.     I don't know that.

11    Q.     You've never looked at the indictment?

12    A.     No.  What I did is --

13           MR. ELLINWOOD:  Your Honor, can he please answer

14    the questions that I'm asking?

15           THE COURT:  He did say no.

16    Q.     When you were being, when Mr. Doherty was asking you

17    questions, you said that you came back voluntarily once you

18    found out you had been indicted, correct?

19    A.     Yes, sir.

20    Q.     So let's talk about what happened in the Philippines.

21    You talked to a board of immigration attorney in the

22    Philippines, correct?

23    A.     Yes.

24    Q.     All right.  And did he tell you that there was an FBI

25    agent who was interested in you?

1    A.    No.

2    Q.    Did you ever, right before you flew, did you meet with

3    FBI Special Agent John Sapanoso?

4    A.    Yes, I did.

5    Q.    And he gave you a letter saying that your U.S.

6    passport had been revoked, correct?

7    A.    That's right.

8    Q.    And he had to give you some temporary passport so that

9    you could fly back?

10   A.    Yes, sir.

11   Q.    So at this time, these were your options:  You could

12   voluntarily come back, which would mean take a direct flight

13   from Manila to Los Angeles where you would be met by IRS

14   special agents and that's what happened, correct?

15   A.    That's right.

16   Q.    Now, if you did not do that, your passport had been

17   revoked, correct?

18   A.    I didn't know that at that time.

19   Q.    I just asked you if you had gotten a letter from

20   Special Agent John Sapanoso saying that your U.S. passport

21   had been revoked and you said yes.

22   A.    No, no, no.  I didn't have, the honest truth is I

23   didn't have any idea that my passport had been revoked until

24   I talked to this fellow John Sapanoso.  I didn't get no

25   letter, he called me and told me.

1    Q.      He called you and told you?

2    A.      Yes.  But I had contacted Miss Krigsman before he ever

3    contacted me.

4    Q.      Once your passport's been revoked, the Philippines,

5    they would have begun to move to have you removed for

6    immigration violations, wouldn't they?

7            MR. DOHERTY:  I'd object based on his knowledge.

8    How could he know that?

9            THE COURT:  Sustained.

10           MR. ELLINWOOD:  I don't know if he knows.

11           THE COURT:  You can ask him if he knows.

12   BY MR. ELLINWOOD:

13   Q.      Do you know whether or not the Philippines would have

14   had you put into immigration proceedings because your U.S.

15   passport had been invoked?

16   A.      No, I didn't know that.  The fact is I flew to Manila

17   to meet with this gentleman to find out what I was supposed

18   to do next to come here.

19           MR. ELLINWOOD:  No further questions, Your Honor.

20           THE COURT:  All right.  Redirect, Mr. Doherty.

21           MR. DOHERTY:  Yes, Judge.  If it please the

22   court.

23                    REDIRECT EXAMINATION

24   BY MR. DOHERTY:

25   Q.      Mr. Malone, let me draw your attention to a letter

1     that counsel talked to you about from a person by the name of

2     Larson, a lawyer at DOJ.  Do you remember him talking to you

3     about that?

4     A.    Yes.

5     Q.    Was that a court order or was that a letter from a

6     lawyer?

7     A.    I'm not sure which letter you're talking about.

8     Q.    The letter that they were talking about Dr. Sweet's

9     injunction covers you, that letter.

10    A.    I don't know who it came from.

11    Q.    Okay.  If it was a court order, would you follow it?

12    A.    Absolutely.

13    Q.    Let me get back to the documents that were filed in

14    the court in Peoria.

15    A.    Okay.

16    Q.    You continually told counsel that Milton Baxley had

17    been acting as your lawyer?

18    A.    Yes.

19    Q.    Had he filed a notice of appearance?

20    A.    For me?

21    Q.    Yeah.

22    A.    No.

23    Q.    Had he filed a notice of appearance for the Joy

24    Foundation in Peoria?

25    A.    No.

1   Q.      Had he drafted all of the documents that you signed?

2   A.      Every one of them.

3   Q.      Okay.  And when you say to the jury that he acted as

4   your lawyer, is that what you're telling them?

5   A.      I put my faith in my lawyer just like a person puts

6   faith in their doctor.

7   Q.      Okay.  But did you write those pleadings yourself or

8   did Mr. Baxley?

9   A.      Mr. Baxley.  I couldn't have done that.

10  Q.      All right.  And whether he filed a notice of

11  appearance or he didn't file a notice of appearance, did you

12  author those documents?

13  A.      Yes.

14  Q.      Are you the person who wrote those documents?

15  A.      Oh, no.  I'm sorry.

16  Q.      Now, you indicated you had one year of Bible college?

17  A.      Yes, sir.

18  Q.      Where was that?

19  A.      Springfield, Missouri; Central Bible College.

20  Q.      And let me draw your attention to the notion that

21  counsel talked to you about that you had said during one of

22  these undercover tapes that in your opinion the IRS was a

23  private company, a private corporation.

24  A.      Yes.

25  Q.      Does that make sense to you now?

1    A.    Well, I know now that it isn't.

2    Q.    How about then?

3    A.    I didn't know.

4    Q.    When you said that a federal, I think it was a civil

5    pleading cannot be a federal pleading because all federal

6    pleadings are criminal pleadings.  Do you remember saying

7    something like that?

8    A.    Yeah.

9    Q.    Does that even make sense to you now?

10   A.    No.

11   Q.    Do you know now that there are federal pleadings that

12   are civil pleadings?

13   A.    Yes, sir.

14   Q.    Namely this injunction?

15   A.    Yes, sir.

16   Q.    Do you remember telling the undercover agent not to

17   lie on any forms that you send in to the IRS?

18   A.    Yes, sir.  And I meant that.

19   Q.    All right.  And one of the reasons was that if you lie

20   to the IRS, the chances of you having a problem with the IRS

21   go up?

22   A.    Absolutely.

23   Q.    And of that sum of money that came into the Joy

24   Foundation, tell the jurors what happened to some, just begin

25   to tell the jurors what the expenses were.

1    A.    Well, first of all, you had the expense of the people

2    that worked there.  You had the mailing.  All of the books

3    the IRS, I mean the secret agent handbooks, all of those was

4    like 15 dollars.  Each CD, we bought these from like

5    different suppliers.  Then you had to pay the people that had

6    recruited the persons.  You had the telephones.  You had like

7    a, I forget what they call it, like a printing press type of

8    thing, there was installments on all of that.  You had to buy

9    all the office furniture.  Whatever this was to be, whatever

10    came up, it had to be paid.

11    Q.    Your pay as well as Dr. Sweet's pay as well as Naomi

12    Hall's pay?

13    A.    Yes.

14    Q.    And that all went into that number?

15    A.    Yes, sir.

16    Q.    And when a 1500 dollar subscription or customer was

17    brought into Joy Foundation, how much went back to the person

18    who referred that person?

19    A.    One thousand.

20    Q.    One thousand?

21    A.    Yes, sir.

22    Q.    And you were asked on cross examination if sometimes

23    that $1,000 was deducted before the money was sent to Joy,

24    and your answer was yes?

25    A.    Uh-huh.

1    Q.    And the next question is, and sometimes did you get

2    the whole 1500 and rebate a thousand?

3    A.    Yes.

4             MR. DOHERTY:  Nothing further.

5             THE COURT:  All right.  Thank you, Mr. Malone.

6    You may step down.

7             And Mr. Doherty, you may call your next witness.

8             MR. DOHERTY:  At this point, Your Honor, the

9    defense would rest.

10    *  *  *  *  *  *

11

12

13             I certify that the foregoing is a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16

17                           *s/ Anthony Rolland*

18                         ANTHONY ROLLAND

19

20

21

22

23

24

25